United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re DYNAVAX SECURITIES LITIGATION<br><br>This Document Relates To:<br>ALL ACTIONS. | Case No. 4:16-cv-06690-YGR<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Dkt. No. 51 |

Lead Plaintiff Kwok Pang, individually and on behalf of all other persons similarly situated, brings this consolidated class action against Defendants Dynavax Technologies Corporation, Eddie Gray, Michael S. Ostrach, and Robert Janssen for violation of federal securities laws. Plaintiff alleges violation of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) based upon knowingly or recklessly disseminating false and misleading statements about the Dynavax's development and efforts to gain FDA approval of HEPLISAV-B, an investigational adult hepatitis B vaccine. The consolidated amended complaint on behalf of the putative class was filed March 17, 2017. (Dkt. No. 47.)

Defendants have filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that plaintiff has not pleaded the elements of the 10(b) claim with sufficient particularity as required by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b), and that the claim for control person liability under section 20(a) fails for the same reason.

Having carefully considered the papers submitted, the operative pleading in this action, the matters judicially noticeable,[1] and the parties' oral arguments, and for the reasons set forth below, the Court **GRANTS** the Motion to Dismiss **WITH LEAVE TO AMEND**. Plaintiff allegations regarding false and misleading statements all turn on the assertion that adverse cardiac events occurring in the company's latest clinical trial should have been disclosed along with other "Adverse Events of Special Interest" or "AESIs" that were disclosed to investors. However, plaintiff now concedes that the adverse cardiac events did not fall into the AESI category for the study. Consequently, plaintiff's repeated incorporation of this same mistaken allegation undermines the viability of the entire complaint.

## I. SUMMARY OF FACTS

Defendant Dynavax is a clinical-stage biopharmaceutical company with multiple product candidates in development for the prevention of infectious disease, the treatment of autoimmune and inflammatory diseases, and the treatment of cancer. (Consolidated Amended Complaint, Dkt. No. 47 ["CAC"] at ¶ 2.) Defendant Eddie Gray is the CEO and a director of the company; defendant Michael S. Ostrach is a Senior Vice President, Chief Financial Officer, and Chief Business Officer; and defendant Robert Janssen is a Vice President of Clinical Development and Chief Medical Officer. (*Id.* ¶ 3.) Dynavax's HEPLISAV-B vaccine was, during the relevant time period, Dynavax's "lead vaccine product candidate," and its only product candidate in a Phase III clinical trial development stage of the FDA approval process. (*Id.* ¶ 26.) In a 2015 SEC filing, Dynavax represented that it did "not have any products that generate revenue" and advised investors that "[i]f we are unable to generate significant revenues or achieve profitability, we may be required to reduce or discontinue our current and planned operations, enter into a transaction that constitutes a change in control of the company or raise additional capital on less than favorable terms." (*Id.* ¶ 26.)

---

[1] Defendants' Request for Judicial Notice (Dkt. No. 51-1, "RJN"), unopposed by plaintiff, is **GRANTED**. The Court takes judicial notice of the press releases, call transcripts, Securities Exchange Commission filings, and Food and Drug Administration (FDA) documents referenced in the complaint. The Court does not, however, consider the statements in the Declaration of Jeff Lombard beyond those identifying and authenticating the documents. Plaintiff's objection to the use of a declaration to extend the arguments and avoid page limitations is well taken.

2

Dynavax submitted to the FDA its initial Biologics License Application ("BLA") for HEPLISAV-B in April 2012. In February 2013, in response to the initial BLA, the FDA issued a Complete Response Letter ("CRL") notifying Dynavax that the BLA could not be approved as presented because there was insufficient data to support the safety of HEPLISAV-B, and that a larger safety database was needed to assess the possibility of rare autoimmune side effects. (*Id.* ¶ 5.)

In late 2013 or early 2014, following negotiations with the FDA, Dynavax finalized the design of its Phase III clinical trial known as "HBV-23." (*Id.* ¶ 6.)[2] In October 2015, Dynavax completed HBV-23, and compiled the data regarding safety and efficacy based on the larger patient database in that clinical trial. The results of HBV-23 revealed what defendants would later refer to as "a numerical imbalance in a small number of cardiac events" not observed in the prior clinical trials for HEPLISAV-B. (*Id.* ¶ 35.) Defendant Janssen was the senior executive charged with evaluating the clinical trial data from HBV-23 and overall strategy for communicating FDA approval prospects. According to a former Dynavax employee, the cardiac events data from HBV-23 posed a challenge for the company, leading it to retain an outside consultant to review the clinical trial data, in addition to performing its own review and analysis. (*Id.* ¶ 37.)

On January 7, 2016, Dynavax issued a press release and an SEC Form 8-K announcing that it had preliminary "top-line results" from HBV-23, and had plans to resubmit a revised BLA for approval of HEPLISAV-B at the end of the first quarter of 2016. (*Id.* ¶¶ 39, 40.) It stated, in part:

> The coprimary endpoint of HBV23 was to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events . . . . All adverse events considered to represent potential autoimmune disorders (Adverse Events of Special Interest, or AESIs) were reviewed by an independent panel of experts from the Mayo Clinic. . . . Of the 33 AESIs in the study, 21 were adjudicated to be autoimmune events by the independent panel, with 11 reported in participants who received HEPLISAV-B and 10 in participants who received Engerix-B.

---

[2] In an October 2013 investor call, Dynavax represented that it had finalized a study design to meet the objective of "providing confidence to the [FDA] regarding HEPLISAV's safety profile. . . . and evaluate the overall safety of HEPLISAV[-B] with respect to clinically significant adverse events." (RJN Exh. 2 at 4.)

(*Id.* ¶ 40.)[3] Defendant Janssen was quoted in the press release as saying:

> These topline results are consistent with our expectations. With regard to the principal safety focus, Adverse Events of Special Interest, the results reflect a distribution consistent with randomization. To see such statistically significant differences in immunogenicity so consistently and across all groups and patient subsets, confirms the potential of HEPLISAV-B for people in need of protection.

(*Id.* ¶ 42.) There was no discussion in the press release regarding cardiac events.[4] Dynavax indicated in other announcements that complete results of HBV-23 would be available in February 2016. (*Id.* ¶ 44.)

On March 8, 2016, Dynavax filed a Form 10-K with the SEC stating that "[t]he primary objectives of HBV-23 were: (1) to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events; and (2) to demonstrate the noninferiority of the peak seroprotection rate induced by HEPLISAV-B compared to Engerix-B in subjects with type 2 diabetes mellitus . . . . Based on preliminary top-line results from HBV-23 released in January 2016, both co-primary endpoints were met." (*Id.* ¶ 48.) That same date, Dynavax issued another

---

[3] The January 7 Press Release, as provided in full in the RJN, further stated that:
Both co-primary endpoints [of the HBV-23 clinical trial] were met. The rates of clinically significant adverse events were consistent with randomization and similar to rates in prior trials and HEPLISAV-B provided a statistically significant higher rate of seroprotection than [the comparison/competitor vaccine] EngerixB in diabetic participants and in all participants as a group.
(RJN Exh. 5 at 1.)

[4] In their RJN, defendants provided a transcript of the January 7, 2016 investor call. (RJN Exh. 6.) In that call, defendant Gray stated that he was "very pleased to report today that this study met all of our expectations . . . . HEPLISAV-B and HBV-23 met our expectations with respect to safety and immunogenicity. We are on track to submit our BLA at the end of this quarter." (RJN Exh. 6 at 3.) Defendant Janssen stated: "regarding safety, in HBV-23, the overall safety profile of HEPLISAV-B was similar to that of Engerix-B. Adverse events were generally balanced between the vaccine groups and AESIs as predetermined by FDA were also balanced. Additionally, as with every study, especially of this size, we've noted some numerical imbalances, none of which are statistically significant." (*Id.* at 5.) Contrary to defendants' statement that "no one on the conference call asked any questions regarding numerical imbalances" (Motion at 7:3), analysts did pose follow-up questions regarding what defendants meant by imbalances, to which Gray responded that "the key message here is that all of the numbers appear to be balanced. The only obvious imbalance in numbers appears to be Bell's palsy, and that's balanced out across the total database." (RJN Exh. 6 at 7-8.)

4

press release and Form 8-K stating that the "third pivotal study had met both co-primary endpoints," that it planned to resubmit HEPLISAV-B to the FDA for approval by the end of the month, and that "[b]ased on our expectation of a six-month review, if our application is approved we expect to launch this product in the fourth quarter of this year." (*Id.* ¶ 46.)

On March 30, 2016, Dynavax issued a press release and filed a Form 8-K stating that the FDA had accepted for review its new BLA based upon the results of HBV-23. (*Id.* ¶ 50.) On April 27, 2016, Dynavax issued a press release and filed a Form 8-K announcing that the FDA has issued a notification that the Prescription Drug User Fee Act (PDUFA) action date for HEPLISAV-B was extended by three months to December 15, 2016. (*Id.* ¶ 53.) In that press release, Dynavax stated that:

> HEPLISAV-B has a safety profile similar to that of existing vaccines. The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 10,000 HEPLISAV-B compared with more than 4000 ENGERIX-B participants.

(*Id.* ¶ 54.)

On June 11, 2016, Dynavax issued a press release and Form 8-K announcing that it had presented new efficacy data on HEPLISAV-B at the 76th Annual Scientific Sessions of the American Diabetes Association in April 2016, and that:

> In the total trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. All adverse events considered to represent potential immune-mediated disorders were reviewed by an independent, blinded Safety Evaluation and Adjudication Committee, which classified these events as not related to vaccination.

(*Id.* ¶ 57.)

On August 5, 2016, Dynavax issued two press releases and a Form 8-K announcing its financial results for the second quarter, as well as the FDA's scheduling of a November 16, 2016 Vaccines and Related Biological Products Advisory Committee (VRBPAC) meeting as the next step in its review of HEPLISAV-B. (*Id.* ¶ 61.) One of the press releases also stated that, in the HBV-23 trial, HEPLISAV-B "demonstrated a similar safety profile to the existing vaccine." (*Id.* ¶ 62.)

On September 2, 2016, the FDA issued a notice cancelling the VRBPAC meeting. (*Id.* ¶ 65.) On this news, the stock price per share of Dynavax declined from $15.94 on September 1, 2016, to close at $10.91 on September 2, 2016. (*Id.* ¶ 77.) On September 4 and 6, respectively, Dynavax issued a press release and filed a Form 8-K announcing that the VRBPAC meeting had been cancelled by the FDA, and stating that remaining questions would be addressed via information requests from the FDA over the coming weeks. (*Id.* ¶ 65.)[5]

On October 3, 2016, Dynavax filed a Form 8-K stating that it had received "anticipated requests for information from the [FDA] review team in connection with the pending [BLA] for HEPLISAV-B . . . . [and t]he review team's questions are in line with the company's expectations." (*Id.* ¶ 67.) It continued, stating that Dynavax was "working with the FDA to resolve remaining questions regarding the BLA in order to enable the FDA to complete its review by the scheduled Prescription Drug User Fee Act ('PDUFA') action date of December 15, 2016, which remains unchanged." (*Id.*)

On October 26, 2016, Dynavax issued a press release and Form 8-K announcing "sub-group results" from the HBV-23 clinical trial, which stated:

> In the total Phase 3 trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. The most common local adverse event was injection site pain and the most common systemic adverse events were fatigue, headache and malaise. All adverse events considered to represent potential immune-mediated disorders were reviewed by an independent, blinded Safety Evaluation and Adjudication Committee (SEAC). The SEAC classified all potential immune-mediated disorders as unrelated to vaccination.

(*Id.* ¶ 70.)

On November 7, 2016, Dynavax issued a press release and a Form 8-K announcing financial results for the third quarter and stating that:

> In late August, the U.S. Food and Drug Administration (FDA) cancelled its previously scheduled Vaccines and Related Biological Products Advisory Committee (VRBPAC) meeting to review the Biologics License Application

---

[5] The September 4 Press Release stated that, despite the cancellation of the VRBPAC meeting and the further questions from the FDA, the PDUFA date of December 15, 2016 "remains unchanged." (RJN Exh 14.)

> (BLA) for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)]. The FDA indicated that remaining questions on the BLA will be addressed between Dynavax and the FDA review team. The Company has since provided responses to information requests by the FDA related to remaining questions . . . . In the total Phase 3 trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. . . . Preparations for launch of HEPLISAV-B are continuing . . . .

(*Id.* ¶ 75.)

On November 14, 2016, the FDA issued a second complete response letter (CRL) to Dynavax, this time regarding the March 2015 BLA submission. Dynavax's press release regarding the second CRL indicated that the FDA sought:

> information regarding several topics, including clarification regarding specific adverse events of special interest (AESIs), a numerical imbalance in a small number of cardiac events in a single study (HBV-23), new analyses of the integrated safety data base across different time periods, and post-marketing commitments. In the CRL, the FDA acknowledged that it has not yet completed its review of *responses received from Dynavax in early October*, including those pertaining to AESIs and *the numerical imbalance in cardiac events*. The responses included an extensive analysis that included independent expert consultation supporting our view that the imbalance was driven by an unexpectedly low number of events in the comparator arm. It would appear the Agency could not fully assess the responses in the current review period. In the CRL, there is no request for additional clinical trials and there are no apparent concerns with rare serious autoimmune events.

(*Id.* ¶ 78, emphasis supplied.) The press release that day quoted defendant Gray as stating, "[t]he CRL is consistent with our opinion that HEPLISAV-B is approvable and we are seeking to meet with the FDA as soon as possible." (*Id.* ¶ 79.) On an earnings conference call that same day, when queried by an analyst about details of the cardiac events, Gray stated "we are not going to go into any more detail than we have given . . . . We have [an] imbalance in a single term which the agency referred to as cardiac events and so we have utilized their language in our communication of it." (*Id.* ¶ 82.) When pressed on "not having more transparency" in the call, Gray responded by stating that it "would not be normal practice to talk about numeric imbalances unless it reaches some degree of statistical significance or [if] perhaps you feel there is a good reason to believe that there might be a relationship. This situation meets neither of those criteria. And I think I will ask

Rob [Janssen], as our Chief Medical Officer, who has [lived] with this data for the last year to give you his assurance of our confidence in this position." (*Id.* ¶ 84.) Janssen added,

> So I led the team that did all the analyses and wrote the BLA and responses to the information requests and actually did many of the analyses myself, wrote the response to the information requests. We did seek external consultation from very highly regarded external experts. And all of this expanded work I think just continued to convince me that there is no relationship between the cardiac events and the vaccine."

(*Id.* ¶ 85.)

The next business day, the price of Dynavax common stock dropped 64% -- from $11.60 per share on Friday, November 11, 2016, to close at $4.10 per share on Monday, November 14, 2016. Thereafter, in March 2017, Dynavax announced a restructuring of the company, suspension of manufacturing, commercial, and other preparations related to HEPLISAV-B, and reduced its workforce by 40%. (*Id.* ¶ 90.)

## II. APPLICABLE STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1010 (9th Cir. 2011). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

8

15 U.S.C. § 78j(b). One of those rules promulgated under the Act is Securities and Exchange Commission Rule 10b–5, which makes it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a claim under Section 10b, a plaintiff must "show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis in original)). Thus, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37-38 (quoting *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157 (2008)). Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b). The PSLRA also requires particularity in pleading the required state of mind: "in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (internal quotation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313 (2007); 15 U.S.C. § 78u-4(b)(1)- (2).

**III.   DISCUSSION**

Defendants argue that the section 10(b) claim must be dismissed because, among other things, plaintiff has failed to allege a materially false statement sufficient to state a claim under

Section 10(b). The heightened pleading requirements of the PSLRA require that a plaintiff specify each misleading statement, why the statement is misleading, and the facts giving rise to inferences or statements made on information and belief. 15 U.S.C. § 78u-4; *see also Tellabs,* 551 U.S. at 321; *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)).

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information," but instead a duty to include all facts necessary to render a statement accurate and not misleading, once it elects to disclose that material information. *Matrixx*, 562 U.S. at 44-45, 47 ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market."); 17 C.F.R. § 240.10b–5(b). A fact is only material if "a reasonable investor would have viewed the undisclosed information as having *significantly* altered the total mix of information made available." *Matrixx*, 563 U.S. at 44. "Silence, absent a duty to disclose, is not misleading" as there is no "affirmative duty to disclose any and all material information." *Id*. at 45. Rather, material information only needs to be disclosed if its omission would "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Here, the allegations of the CAC are that defendants made materially false and misleading statements by offering information about certain positive aspects of the HEPLISAV-B safety profile, including the rates of occurrence of certain AESIs during the HBV-23 clinical trial, but failed "to disclose the occurrence *of other AESIs* of which they were aware or that they recklessly disregarded, including 'a numerical imbalance in a small number of cardiac events.'" (CAC ¶ 41, emphasis supplied.) Plaintiff alleges:

> Given that HBV-23 was designed in a purported effort to address the FDA's safety concerns about HEPLISAV-B, that investors were concerned specifically about the HEPLISAV-B's safety profile, that Defendants observed cardiac events in HBV-23 but not in either of the Company's prior Phase III studies for HEPLISAV-B, that *AESIs* were an area of known concern to the FDA, and that the FDA considered cardiac events to be among the more serious of safety concerns, Defendants' statements about the results of HBV-23 deprived investors

10

of information critical to assessing HEPLISAV-B's prospects and timeline for obtaining FDA approval.

(*Id.,* emphasis supplied.) Similarly, in paragraph 43 of the complaint, plaintiff alleges:

> The foregoing statements in the January 7 Press Release were false and misleading. Defendants' discussion of the "topline results" from HBV-23 in the January 7 Press Release mentioned certain aspects of the safety profile of HEPLISAV-B and the occurrence of certain AESIs, but *failed to disclose the occurrence of other cardiac AESIs, including "a numerical imbalance in a small number of cardiac events."* The occurrence of such cardiac events in HBV-23. . . . constituted red flags which, given the FDA's known concern *regarding adverse events of special interest* and that cardiac events were considered to be among the more serious of safety concerns for the FDA, signaled that such issues certainly would not be resolved during the 2016 fiscal year. Defendants' statement that the "topline results" were "consistent with [their] expectations" was false when made, and Defendants' omission of any mention of the *occurrence of cardiac AESIs* rendered misleading their discussion of adverse events of special interest that occurred in HBV-23.

(*Id.* ¶ 43, emphasis supplied.) Thus, the focus of plaintiff's allegations is on "cardiac AESIs" and whether the cardiac events observed in the HBV-23 clinical trial should have been disclosed along with reporting the occurrence of other "AESIs" in order for the statements to avoid being misleading. For each of the statements identified as the basis for their claim, plaintiffs refer back to paragraphs 41 and 43 for the reasons why those statements are false or misleading. (*See id.* ¶¶ 47, 49, 66, 68, 71, 76.)

Defendants argue that this reliance on failure to disclose "cardiac AESIs" is the fatal flaw of the complaint. The clinical trial specifically analyzed "[a] pre-specified list of autoimmune and inflammatory disorders" referred to as Adverse Events of Special Interests, or "AESIs," and cardiac events or diseases were not among the AESIs included in the definitions for the study. (*See* RJN Exh. 25 at 19, 80.) The alleged press releases and filings identified in the complaint referred to the AESIs as defined for the purposes of the study. As plaintiff acknowledges, the FDA uses the term AESIs to refer to events of scientific and medical concern "specific to the sponsor's product or program." (CAC ¶ 7 n.3.) In the HBV-23 clinical trial, Dynavax worked with FDA to identify a list of autoimmune and inflammatory disorders that constituted the AESIs for the study. (RJN Exh. 25 at 19.)

11

At the hearing on the motion, plaintiff acknowledged the "fatal flaw" argued by defendants, conceding that the complaint as drafted misconstrued the term AESIs. Plaintiff now contends that failure to disclose the cardiac events—in the context of defendants' other statements about the safety of the HEPLISAV-B vaccine, the clinical trial results, and FDA approval timeline—made the statements false and misleading, even if cardiac events are not AESIs.

The Court has reviewed the CAC carefully. Plaintiff's reliance on paragraphs 41 and 43 to explain why each identified statement is false or misleading, and the acknowledged error regarding cardiac events being AESIs, renders the allegations inactionable. Whatever merit plaintiff's arguments in opposition may have, they are not the allegations made in the complaint.

## IV. CONCLUSION

Accordingly, the Motion to Dismiss is **GRANTED WITH LEAVE TO AMEND**. In amending, plaintiff is directed to specify each statement upon which the claim is based, whether such statement is alleged to be an affirmative misrepresentation or an omission, and why each statement was materially false or misleading.[6]

Plaintiff shall file an amended complaint no later than **October 3, 2017**. Defendants shall file their response within 21 days of the filing of the amended complaint.

This terminates Docket No. 51.

**IT IS SO ORDERED**.

Date: September 12, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[6] Because the Court finds that plaintiff has failed to allege actionable statements or omissions under section 10(b), the Court need not address whether plaintiff adequately alleged scienter, inapplicability of the PSLRA's safe harbor provisions, or section 20(a). Nevertheless, the Court notes that plaintiff must allege facts to support an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," evaluating the circumstances holistically. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (noting abrogation of holding in *In re Vantive Securities Litigation,* 283 F.3d 1079 (9th Cir. 2002)).

On a separate note, defendants are cautioned that they should disclose fully to the Court the history of a case cited for its precedential value. To do otherwise is potentially sanctionable conduct. (*See* Motion at 12, 16 and Reply at 7 [citing *In re Vantive Corp. Sec.*, 110 F.Supp. 2d 1209, 1216 (N.D.Cal. 2000) and noting that it was affirmed, but not indicating that the Ninth Circuit decision was subsequently abrogated by the Supreme Court in *Tellabs*]).