Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Dynavax Technologies Corporation Securities Litigation | Master File No. 4:16-cv-06690-YGR |
| | CLASS ACTION |
| This Document Relates To: | **CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| ALL ACTIONS. | |
| | JURY TRIAL DEMANDED |

Lead Plaintiff Kwok Pang ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Dynavax Technologies Corporation ("Dynavax" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**OVERVIEW**

1.      In response to U.S. Food and Drug Administration ("FDA") comments on the safety profile of the Company's investigational adult hepatitis B vaccine, HEPLISAV-B—the Company's most important product and its product closest to FDA approval and commercialization—Defendants conducted a Phase III clinical study to compare "head-to-head safety and immunogenicity data" among HEPLISAV-B and Engerix-B ("Engerix"). The FDA initially approved the Engerix-B vaccine in 1989 and pharmaceutical giant GlaxoSmithKline had been marketing it for years. Defendants designated the Phase III trial Dynavax conducted as "HBV-23" and called it "pivotal." From the beginning of the Class Period, summarizing the HBV-23 data, Defendants publically concluded that "[c]onsistent with all of our previous trials, these data show that HEPLISAV-B provided higher rates of protection earlier with fewer doses and a ***similar safety profile***." (Emphasis added).

2.      Describing "clinically significant" adverse events from the greatly expanded population in the HBV-23 trial, Defendants claimed to disclose one incident of a rare autoimmune disorder from over 5,500 patients that, they concluded, was unrelated to HEPLISAV-B because, they stated, they knew the market expected "transparency." They also described adverse events from HBV-23 such as injection cite discomfort and headaches. Yet, even as Defendants disclosed these minor adverse events and statistically insignificant instances of rare disorders, and even as they concluded that the safety profile of HEPLISAV-B was similar to that of Engerix-B, they failed to disclose that the study showed a numerical imbalance of cardiac adverse events of which they were aware.

3.      Dynavax and three of its officers—CEO Eddie Gray, Senior VP and CFO Michael Ostrach, and Chief Medical Officer Robert Janssen[1]—knew of the imbalance in cardiac events data

---

[1] Plaintiff refers to Dynavax, Gray, Ostrach, and Janssen collectively herein as "Defendants."

for a year prior to the Company's belated revelation to the market. Omitting the numerical imbalance in cardiac events from their public statements during the Class Period, Defendants made a series of uniformly positive statements touting the "overall safety" of the vaccine, disclosing non-statistically significant numerical imbalances in adverse events and selectively disclosing the occurrence of certain other, non-cardiac adverse events.

4.      Upon discovering the existence of the numerical imbalance in cardiac adverse events, investors sent the Company's stock price plummeting from $15.94 to $4.10 over two successive disclosures.

## NATURE OF THE ACTION

5.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired the securities of Dynavax traded on the NASDAQ Stock Market ("NASDAQ") from January 7, 2016 to November 14, 2016, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Dynavax and certain of its officers and directors for violations of federal securities laws (the "Class").

6.      In February 2013, following the FDA's rejection of its initial Biologics License Application ("BLA") for HEPLISAV-B, Dynavax designed and conducted the HBV-23 follow-on Phase III clinical study to address the FDA's safety concerns. Specifically, with respect to safety, Defendants designed the HBV-23 trial with "the primary safety objective [] to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events."[2]

_____

[2] Clinical significance is the practical importance of the treatment effect; that is, whether the effect has a real, palpable, noticeable effect on daily life, irrespective of whether such effect is due to an intervention in the context of a clinical trial. *See Segen's Medical Dictionary* (2011).

Consolidated Second Amended Class Action Complaint

7.     HEPLISAV-B is a two-dose vaccine intended to treat the viral disease of the liver known as hepatitis B and will compete commercially against three-dose hepatitis B vaccines currently on the market, including GlaxoSmithKline's Engerix-B, among others. During the Class Period, Defendants touted it as having superior immunogenicity rates than Engerix and a comparable safety profile.

8.     In October 2015, Dynavax completed HBV-23. By November 2015 Defendants had received data obtained from HBV-23, including what Defendants referred to after the Class Period as "a numerical imbalance in a small number of cardiac events" that they had not observed in either of the Company's first two Phase III clinical trials for HEPLISAV-B. Even by including the HBV-23 data with all of the other safety data they had accumulated in all human trials they had conducted, Defendants could not bring the cardiac events back into balance.[3]

9.     Defendants claimed to have sought to determine whether the cardiac events were causally connected to HEPLISAV-B, ultimately claiming to have sought "external consultation from very highly regarded external experts," but never disclosing the nature of the consultation or any conclusion therefrom. Defendant Janssen, himself, led the team that analyzed the cardiac events imbalance.

10.     Defendants knew that disclosure of cardiac events, a potentially serious safety issue known as an "adverse event,"[4] would have a substantial, negative impact on the market for the

---

[3] With respect to Bell's palsy, an Adverse Event of Special Interest ("AESI"), Defendants claimed to have evaluated data "in more depth since there was a small imbalance between the vaccine groups." They concluded, however, that "[w]hen we added to the data from the previous HEPLISAV trials, the balance was restored."

[4] The FDA defines "adverse event" as "any undesirable experience associated with the use of a medical product in a patient." The term do not imply that a causal connection exists between the

Company's stock. They also knew that the FDA would be keenly interested in understanding the details of any cardiac adverse events. Cardiac events were a known area of concern for the FDA, and according to Defendants, themselves, "[w]e and the FDA have always recognized the potential for a random event to occur in a trial of this size and duration, and the FDA has consistently maintained that its primary interest is understanding the detail of any specific case."

11.     Defendants admitted, during the Class Period, that they had been engaged in a "very open and productive," ongoing "dialogue with the FDA." They knew what issues concerned the FDA, and they were intent on addressing those questions "expeditiously in order to enable the FDA to complete its review as soon as possible." In their public statements Defendants advised investors that nothing the FDA had asked for was surprising to them. At no time during the Class Period, however, did Defendants disclose what the FDA's "remaining questions" were or how they intended to address them.

12.     Nevertheless, during the Class Period, Defendants omitted the numerical imbalance in the occurrence of the cardiac adverse events during HBV-23, misrepresenting the comparability of the safety profile of HEPLISAV-B to Engerix-B and leading the market to believe that no numerical imbalance in adverse events was material.

13.     Rather, throughout the Class Period, Defendants reiterated that "[t]he overall safety profile of HEPLISAV-B was similar to that of Engerix-B. Adverse events were generally balanced between vaccine groups. AESIs were also balanced." They disclosed the occurrence of "some numerical imbalances," dismissing them as statistically insignificant, while omitting a numerical

---

product and the adverse event. *See* *https://www.fda.gov/safety/medwatch/howtoreport/ucm053087.htm.*

Consolidated Second Amended Class Action Complaint

imbalance in cardiac adverse events. And they disclosed the occurrence of certain non-cardiac adverse events while omitting from their statements any mention of the cardiac adverse events.

14.     Defendants' claims that HEPLISAV-B's safety profile was "similar" or "comparable" to that of Engerix was false. HEPLISAV-B's safety profile included an imbalance in the occurrence of cardiac adverse events that Defendants knew or recklessly disregarded were a known area of concern to the FDA. Defendants' statements that the numbers of adverse events were "generally balanced" were false because, as Defendants belatedly disclosed, there was a numerical imbalance in the occurrence of cardiac adverse events. By selectively disclosing "some numerical imbalances" but not the imbalance in cardiac adverse events, and by selectively disclosing the occurrence of certain non-cardiac adverse events but not the cardiac adverse events, Defendants misled investors into believing that no cardiac adverse events had occurred during HBV-23 and that no adverse events threatened to derail timely FDA approval of HEPLISAV-B.

15.     Defendants' Class Period statements omitted information critical to assessing HEPLISAV-B's timeline and prospects for obtaining FDA approval. By misrepresenting HEPLISAV-B's safety profile and failing to disclose the numerical imbalance in cardiac adverse events, Defendants concealed the enhanced risk that the Company's BLA for HEPLISAV-B would be delayed and/or rejected by the FDA along the path to regulatory approval.

16.     On November 14, 2016, after the FDA rejected the BLA Dynavax re-submitted, Defendants finally disclosed to the market that, among the reasons the FDA did not approve the BLA was that "a numerical imbalance in a small number of cardiac events" had occurred during the administration of HBV-23. Analysts at the earnings conference call that same day pressed Defendants about the imbalance in cardiac events.

17.     Analysts expressed concern Defendants' lack of transparency on the issue of HEPLISAV-B's safety profile, and the price of Dynavax common stock plummeted 64% on this news.  By virtue of their Class Period purchases of the Company's common stock, Plaintiff and members of the Class have been damaged.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business in this District, have an office in this District, and a significant portion of the Defendants' actions and the subsequent damages took place within this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiff Kwok Pang, as set forth in the attached Certification, acquired Dynavax securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

23.     Defendant Dynavax is a clinical-stage biopharmaceutical company with multiple product candidates in development for the prevention of infectious disease, the treatment of autoimmune and inflammatory diseases, and the treatment of cancer.  Dynavax is headquartered in Berkeley, California and maintains an office at 2929 Seventh Street, Suite 100, Berkeley, California 94710. Its shares of common stock trade on NASDAQ under the ticker symbol "DVAX."

24.     Defendant Gray served as the Company's Chief Executive Officer ("CEO") throughout the Class Period.

25.     Defendant Ostrach served as the Company's Senior Vice President, Chief Financial Officer ("CFO"), and Chief Business Officer throughout the Class Period.

26.     Defendant Janssen served as the Company's Vice President, Clinical Development and Chief Medical Officer throughout the Class Period.

27.     Plaintiffs refer to Gray, Ostrach, and Janssen collectively as the "Individual Defendants."

28.     Plaintiffs refer to the Individual Defendants together with Dynavax collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

*Background*

29.     Dynavax is a clinical-stage biopharmaceutical company with multiple product candidates in development for the prevention of infectious disease, the treatment of autoimmune and inflammatory diseases, and the treatment of cancer.  During the Class Period, Dynavax securities were traded on NASDAQ under the symbol "DVAX."

30.     Dynavax uses toll-like receptor ("TLR") biology to discover and develop novel vaccines and therapeutics.  The Company's development programs are focused on vaccines and cancer immunotherapy.  TLRs are a family of transmembrane proteins that play a vital role in innate and adaptive immunity.  HEPLISAV-B combines a TLR with an antigen manufactured by Dynavax GmbH, its wholly-owned subsidiary located in Germany.

31.     Dynavax's leading product candidate is known as HBsAg-1018 or HEPLISAV-B, a two-dose adult hepatitis B vaccine currently in FDA Phase III clinical development.  Hepatitis B is a viral disease of the liver that can become chronic and may lead to cirrhosis of the liver, hepatocellular carcinoma, and death.  If approved by the FDA, HEPLISAV-B will compete commercially against the conventional three-dose hepatitis B vaccines currently on the market.

32.     Defendants have stated that "[o]ur success is primarily dependent on our ability to obtain regulatory approvals for our most advanced product candidates."  Annual Report of Dynavax Tech. Corp. on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") at 11.

33.     HEPLISAV-B was, and is, considered by Defendants to be the Company's "lead vaccine product candidate."   2015 10-K at 4.   The Company's product candidates other than HEPLISAV-B were not far along in the FDA approval process.   HEPLISAV-B is the Company's only product candidate in Phase III.  During the Class Period, the Company's other product candidates were either early in Phase II or pre-clinical.  *See* 2015 10-K at 4 (noting that SD-101 was in Phase 1/2, AZD was in Phase 2 Planning, and both DV281 and CpG-Nanoparticles were pre-clinical).  Indeed, the Company does "not have any products that generate revenue" and have advised investors that "[i]f we are unable to generate significant revenues or achieve profitability, we may be required to reduce or discontinue our current and planned operations, enter into a transaction that constitutes a

1   change in control of the company or raise additional capital on less than favorable terms." 2015 10-

2   K at 20.

3          34.    Obtaining FDA approval of HEPLISAV-B was critical to the Company's continuing

4   existence.   HEPLISAV-B was the Company's only product nearing regulatory approval and,

5   consequently, its only product approaching the point where it could generate revenue for the

6   Company, which Defendants stated was integral to its continuing existence.  Indeed, during the Class

7   Period, Defendants stated that "[w]e currently estimate that we have sufficient resources to meet our

8   anticipated cash needs through at least the next 12 months based on cash, cash equivalents and

9   marketable securities on hand as well as anticipated revenues and expenditures." 2015 10-K at 20.

10          35.    In light of all of the foregoing, analysts have concluded that "Dynavax currently has

11   no approved products in its kitty and has been pinning hopes on Heplisav's approval." *See* "Dynavax

12   Rebounds on Same PDUFA Date for Heplisav BLA," published on *zacks.com* (9/7/16).

13          36.    Prior to the Class Period, Dynavax conducted two Phase III studies, known as HBV-

14   10 and HBV-16, aimed at evaluating the safety and efficacy of HEPLISAV-B.  Based upon the data

15   obtained from these two prior clinical trials, the Company submitted its original BLA for HEPLISAV-

16   B to the FDA in April 2012.

17          37.    In February 2013, the FDA issued a Complete Response Letter ("CRL"), notifying the

18   Defendants that it would not approve the BLA as Dynavax presented it, finding that from its two

19   earlier Phase III clinical trials, the Company had obtained insufficient data, supporting the safety of

20   HEPLISAV-B.  The FDA requested an additional clinical trial to increase the size of the safety

21   database, determining that the hypothetical risks warranted a larger safety database to assess the

22   possibility of rare autoimmune side effects.

38.     In early 2014, following negotiations with the FDA, Dynavax finalized the design of an additional clinical study, known as HBV-23, in a purported effort to address the FDA's safety concerns outlined in the February 2013 CRL.

39.     In the months immediately preceding the Class Period, Defendants were aware of the market's focus on overall safety data for HEPLISAV-B.  Analysts who covered voiced their concerns about the drug candidate's overall safety profile directly with management.

40.     A July 1, 2015 William Blair analyst report, for example, noted "the emerging safety profile of Heplisav in the ongoing Phase III HBV-23 study" was among the "key issues investors focused on" during investor meetings with Dynavax management.  *See* Report of William Blair on Dynavax Tech. Corp. (July 1, 2015) at 1.  The July 1, 2015 William Blair report explained that "[t]he safety profile of Heplisav remains a major concern for investors," and that this concern was "related to whether such a novel and powerful adjuvant would lead to increased rates of adverse events of the autoimmune nature."  *Id.*  Analysts noted that, in March 2008, HEPLISAV-B "was put on clinical hold" "when a case of rare autoimmune disease was reported in a German subject five months after she was vaccinated with Heplisav, during the pivotal Phase III PHAST study."  *Id.*  The incident placed Defendants on notice that the occurrence of unexpected adverse events during a Phase III clinical trial could lead to delays in the regulatory approval process.

41.     In the following months Analysts continued to focus on HEPLISAV-B's safety profile.  Repeatedly, analysts focused on the overall safety profile of HEPLISAV-B based on the forthcoming results of HBV-23.  *See, e.g.,* Report of William Blair on Dynavax Tech. Corp. (Aug. 10, 2015) at 1 ("We expect superior efficacy and comparable safety profile for Heplisav as compared head-to-head against Engerix-B, the current standard of care"); Report of JPMorgan on Dynavax Tech. Corp. (Oct. 15, 2015) at 1 ("Top-line results are likely to focus on co-primary endpoints of overall safety

- 11 -

outcomes and seroprotection in diabetic patients relative to Engerix B"); Report of William Blair on Dynavax Tech. Corp. (Nov. 5, 2015) at 1-2 (opining that "top-line results" of the "pivotal Phase III HBV-23 study" were "expected in first quarter 2016" and are "the next major catalyst for Dynavax shares," while noting that one of "[t]he co-primary endpoints of the study" is to "evaluate overall safety profile of Heplisav"); Report of RBC Capital Market on Dynavax Tech. Corp. (Nov. 30, 2015) at 1-2 (advising that "Dynavax's Hepatitis B vaccine Heplisav will report on its third Phase III trial in 1Q16" and that the forthcoming announcement of "top-line data for Phase III Heplisav trial" was an "upcoming catalyst," while identifying as a primary "risk" for investors a "safety signal in Heplisav Phase III trial").

42.     In October 2015, Dynavax completed HBV-23, compiling new data on HEPLISAV-B's safety and efficacy obtained from a patient database of 5,587 HEPLISAV-B participants, effectively doubling the number of patients who received HEPLISAV-B in all previous clinical trials. Defendants informed the market, during the January 7 Call to discuss the results of HBV-23, that "[t]he overall safety profile of HEPLISAV-B was similar to that of Engerix-B," and claimed that "[a]dverse events were generally balanced between the vaccine groups." Unbeknownst to investors, however, researchers had observed during HBV-23 what Defendants later referred to as "a numerical imbalance in a small number of cardiac events."  Defendants had disclosed neither cardiac adverse events nor an imbalance compared to Engerix-B in previous human trials for HEPLISAV-B.

43.     Defendants knew, too, that cardiac adverse events such as those they observed in HBV-23 were a "known area of concern"[5] for the FDA.  In an article authored by six FDA officials

---

[5] *See* Report of RBC Capital Markets on Dynavax Tech. Corp. (Nov. 14, 2016) at 1.

Consolidated Second Amended Class Action Complaint

and published in the *Journal of the American Medical Association* in January 2014,[6] for example, the authors noted as follows:

> We found that some drugs inevitably failed because they proved to be ineffective or unsafe and others failed because the data were inadequate to evaluate safety or efficacy. … The most frequent safety concerns preventing approval were clinical adverse events that occurred in phase 3 trials, particularly those affecting the cardiovascular system.  The high frequency of cardiac adverse events may be due partly to the range of conditions that were included in this category (thrombotic events, arrhythmic events, and other toxicities to the heart).  However, cardiovascular toxicity may escape detection until late in drug development because of poor predictive models.  Also, in recent years, the high-profile withdrawals by companies of cyclooxygenase 2 (COX-2) inhibitors have sensitized the drug development community to similar cardiac issues in new drug applications and there is increasing reluctance to accept certain levels of risk in the absence of a clear, unmet public health need.  Even very large development programs may lack the power to identify serious rare adverse events.

44.     In the context of their knowledge of investor concerns, the FDA's focus on cardiac adverse events as a "known area of concern," and their own statements, Defendants rendered themselves duty bound to disclose the numerical imbalance in cardiac adverse.

45.     For example, Defendants actually anticipated that the FDA would express concern about the numerical imbalance in cardiac adverse events they observed in HBV-23. They admitted as much in an October 3, 2016 Current Report filed with the SEC on Form 8-K, in which the Company stated that it had "received anticipated requests for information from the U.S. Food and Drug Administration's ('FDA') review team in connection with the pending Biologics License Application ('BLA') for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)]. ***The review team's questions are in line with the company's expectations***" (emphasis added).

---

[6] Sacks, Leonard V. et al., "Scientific and Regulatory Reasons for Delay and Denial of FDA Approval of Initial Applications for New Drugs, 2000-2012," at 383, in *JAMA* (Jan. 2014, Vol. 311(4): 378-84).

46. From the beginning of the Class Period, Defendants caused the market to expect that Dynavax would disclose the numerical imbalance in cardiac adverse events in HBV-23. As analyst Simos Simeonidis of RBC Capital Markets stated in his November 14, 2016 report, "An imbalance in cardiac events in Phase III that would be significant enough to be of concern to the FDA was definitely not among the expectations that investors have had for this trial and for this program."

47. Indeed, during a January 7, 2016, conference call with analysts to discuss the results of HBV-23 (the "January 7 Call"), Defendant Gray stated that both the Company and the FDA "have always recognized the potential for a random event to occur in a trial of this size and duration, and the FDA has consistently maintained that its primary interest is understanding the detail of any specific case." This statement indicated to investors that, consistent with HBV-23's purpose of evaluating the "overall safety of HEPLISAV-B with respect to clinically significant adverse events," Defendants would disclose clinical data that they knew would be of concern to the FDA, regardless of its relatedness or statistical significance.

48. Further, during the January 7 Call, Defendant Janssen provided a detailed discussion of a single case in HBV-23 involving a patient that may not have even contracted a rare autoimmune condition, known as Takayasu's arteritis, concluding that Defendants "believe[d] the participant most likely has a vascular condition secondary to its longstanding hypertension." Defendant Gray then stated:

> Rob has commented in detail on the single radiological finding in the study of a rare autoimmune event. Now many of you on the line will be wondering why we have mentioned this at all, which I think is a very fair question. We thought hard about whether it truly had relevance but concluded simply that you would favor transparency. We and the FDA have always recognized the potential for a random event to occur in a trial of this size and duration, and the FDA has consistently maintained that its primary interest is understanding the detail of any specific case.

49.     Thus, Defendants led investors to believe that even if the Company were to find an absence of a causal connection between HEPLISAV-B and an adverse event, the Company would nevertheless disclose the event to the market in the interest of "transparency." By recognizing that even a single "random event" could merit disclosure, Defendants confirmed to the market that statistical significance was irrelevant in whether they disclosed an adverse event and that clinical significance, in the eyes of the FDA, would be paramount. Defendant Gray's statement above that Defendants "***thought hard about whether it truly had relevance*** but concluded simply that you would favor transparency" (emphasis added), underscores that clinical significance, rather than statistical significance, was the paramount factor governing the Company's ultimate determination with respect to disclosure of the cardiac adverse events data.

50.     More, Defendants led the market to believe that causal connection and statistical significance were not the defining parameters of HBV-23. In a January 7, 2016 Press Release, for example, Defendants disclosed summary AESI data, classifying no AESI as "related to vaccination." Thus, investors could not have expected that Defendants would limit the information they provided about numerical imbalances in cardiac adverse events—events the market understood to be among the most serious to the FDA—to those that are related to vaccination or statistically significant.

51.     Still further, during the January 7 Call, Defendant Janssen stated that Defendants had "reviewed all adverse events in the trial, and we found that 33 events were on the list of immune-mediated AESIs provided by FDA." This statement indicated that Defendants reviewed *all* of the safety data, rather than just AESIs, in evaluating HEPLISAV-B's overall safety. By discussing both "adverse events" and "AESIs" with respect to the "overall safety profile of HEPLISAV-B," Defendants indicated their knowledge that the FDA would include in its ultimate assessment of the

vaccine's "overall safety" an analysis of clinically significant adverse events generally, not simply reviewing data relating to AESIs.

52.     Defendant Janssen also noted during the January 7 Call that "adverse events were generally balanced between the vaccine groups," while "AESIs were also balanced." His statement indicated that Defendants' safety analyses focused specifically on the issue of balance, both within given adverse-event categories and across all adverse events observed generally, as well as both in HBV-23 alone and across all three Phase III studies of HEPLISAV-B as an entire data set. It also informed the market that Defendants distinguished between overall safety data from the data pertaining specifically to AESIs.

53.     Still further, Defendant Janssen's statement during the January 7 Call regarding Bell's palsy data also indicated that even the "small" size of an "imbalance between vaccine groups" was irrelevant to whether Defendants disclosed an imbalance in cardiac adverse events.  In HBV-23, there were 5 new onset cases of Bell's palsy within a population of 5,587 new subjects, or 9 one hundredths of one percent (0.0009), meaning that it is highly unlikely that the instances of Bells palsy in HBV-23 were statistically significant. By disclosing the statistically insignificant incidence of Bell's palsy, Defendants manifested their understanding that statistical significance was not a prerequisite for disclosure of particular HBV-23 safety data.

54.     Also during the January 7 Call, Defendant Janssen stated:

> We reviewed ***all adverse events*** in the trial… We evaluated Bell's palsy in more depth since there was a small imbalance between the vaccine groups. When we added to the data from the previous HEPLISAV trials, the balance was restored.

> (Emphasis added).

Defendant Janssen's statement indicated that Defendants had conducted a similar analysis with respect to the cardiac adverse events data, in an effort to bring such events into balance when they

- 16 -

looked across the entire population of trial subject, but were unable to "restore" a similar balance in cardiac adverse events. Given Defendants' focus on balance, that an imbalance among cardiac adverse events data persisted even upon consideration of the total data set for HEPLISAV-B is a red flag of which Defendants had actual knowledge.

55.     Defendants later confirmed that prior to the beginning of the Class Period, they believed the numerical imbalance in cardiac adverse events was sufficiently troublesome that they did not want to make a determination about it without outside assistance. During the November 14, 2016 conference call, Defendants revealed that they had sought "external consultation from very highly regarded external experts." Defendants did not disclose who these experts were, the scope of their consultation, or their conclusion(s), if any. The mere fact that Defendants consulted with an external expert, indicates that the numerical imbalance in cardiac adverse events concerned them. In the context of all of their above statements, revealing specifics related to AESIs that were unrelated to vaccination and represented an infinitesimally small percentage of HBV-23 subjects, and their consultation with an external expert, Defendants were duty bound to disclose the numerical imbalance in cardiac adverse events.

56.     A former Dynavax employee ("FE"),[7] confirms the Company's concern relating to the numerical imbalance in cardiac adverse events. According to FE, Defendant Janssen, the Company's Chief Medical Officer, was the senior executive charged with evaluating the clinical trial data for HBV-23 and overall strategy for communicating the Company's FDA prospects.  FE explained that the cardiac events data posed a considerable challenge for Dynavax in its effort to determine whether

---

[7] FE served as Executive Director of Project Management at Dynavax from July 2014 to November 2016, reporting directly to Dynavax's CEO, Defendant Gray.

such data were "real" or merely an "artifact."[8]   While much of the detailed analysis of this issue, according to FE, was performed by the Company's Clinical Development and Drug Safety department, then under the leadership of the department's Executive Director, Sam Jackson, Dynavax also retained an outside consultant possessing highly specialized credentials to review the clinical trial data and provide an additional perspective.

## Materially False and Misleading Statements

### The January 7 Press Release, Form 8-K, and Conference Call

57.     The Class Period begins on January 7, 2016, when Dynavax issued a press release (the "January 7 Press Release"), which the Company attached as Exhibit 99.1 to the Form 8-K it filed with the SEC on the same date (the "January 7 Form 8-K"), announcing the "preliminary top-line results from HBV-23" and its plans to "resubmit the HEPLISAV-B Biologics License Application (BLA) at the end of the first quarter of 2016." The January 7 Press Release disclosed the following information about the "safety results from HBV-23":

> The co-primary endpoint of HBV-23 was to evaluate the overall safety of HEPLISAV-B with respect to ***clinically significant adverse events***. Participants were randomized to HEPLISAV-B or Engerix-B in a two to one ratio. HEPLISAV-B participants were followed for 52 weeks after the last dose and Engerix-B participants were followed for 28 weeks after last dose. All adverse events considered to represent potential autoimmune disorders (Adverse Events of Special Interest, or AESIs) were reviewed by an independent panel of experts from the Mayo Clinic. (Emphasis added).

> *****

> Dynavax plans to resubmit the HEPLISAV-B Biologics License Application (BLA) at the end of the first quarter of 2016 and anticipates a six-month review by the FDA. In the revised BLA, Dynavax plans to address all issues raised by the FDA in a February 2013 Complete

---

[8] Medical professionals use the term "artifact" to describe anything, especially in a histologic specimen or a graphic record, which is caused by the technique used and does not reflect the original specimen or experiment.

Response Letter by submitting the results of HBV-23, integrated with previous clinical data, and responses to CMC issues in the Complete Response Letter.

58. The foregoing statements in the January 7 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that the "co-primary endpoint of HBV-23 was to evaluate the overall safety of [HEPLISAV-B] with respect to clinically significant adverse events," Defendants were duty bound to make full and complete disclosure regarding the "overall safety profile" of HEPLISAV-B and the occurrence of "clinically significant adverse events" during HBV-23. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived the market of information critical to its assessing HEPLISAV-B's timeline and prospects for FDA approval.

59. Also on January 7, 2016, Defendants participated in the January 7 Call with analysts to discuss the results of HBV-23. Contextualizing HBV-23, Defendants Gray stated:

Although 2 previously completed Phase III studies demonstrated the immunogenicity of HEPLISAV-B and that its overall safety appeared to be similar to the approved vaccine, in reviewing our BLA, the FDA concluded that a larger safety database was warranted. Based on our subsequent consultations with the agency, we designed HBV-23 to include more than 5,500 additional participants in the HEPLISAV-B safety database to provide a sufficiently sized safety database for FDA to make a determination regarding this product.

60. Against that background and in the context of his stating that "the primary safety objective was to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events," Defendants Janssen stated, "[t]he overall safety profile of HEPLISAV-B was similar to that of Engerix-B. Adverse events were generally balanced between the vaccine groups. AESIs were also balanced. Additionally, as with every study, especially of this size, we've noted some

numerical imbalances, none of which are statistically significant." Moreover, once again, Defendant Gray stated that Dynavax was on track to resubmit the HEPLISAV-B BLA to the FDA by March 31, 2016, submitting the results of HBV-23.

61.     The foregoing statements in the January 7 Call were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that "adverse events were generally balanced" and that they expected numerical imbalances, but that none was "statistically significant," Defendants were duty bound to make full and complete disclosure regarding the occurrence during HBV-23 of the numerical imbalance in cardiac adverse events, "clinically significant adverse events" that were among the more "serious" safety concern category in drug development. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived investors of information critical to their assessing HEPLISAV-B's timeline and prospects for FDA approval.

**The March 8 Press Release and Form 8-K, and 2015 10-K**

62.     On March 8, 2016, the Company filed a Current Report on Form 8-K with the SEC (the "March 8 Form 8-K"), attaching a press release the Company issued that day (the "March 8 Press Release"), announcing Dynavax's financial results for the fourth fiscal quarter and fiscal year ended December 31, 2015. The March 8 Press Release quoted Defendant Gray as stating:

> During 2015, we completed HBV-23 . . . . Earlier this year we reported that this third pivotal study had met both co-primary endpoints. We plan to resubmit the HEPLISAV-B BLA . . . to the FDA by the end of this month. Based on our expectation of a six-month review, if our application is approved we expect to launch this product in the fourth quarter of this year.

Consolidated Second Amended Class Action Complaint

63.     The foregoing statements in the March 8 Press Release were false and misleading. In the context of Defendants' statement that HBV-23 had "met both co-primary endpoints," Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that the "co-primary endpoint of HBV-23 was to evaluate the overall safety of [HEPLISAV-B] with respect to clinically significant adverse events," Defendants were duty bound to make full and complete disclosure regarding the occurrence during HBV-23 of the numerical imbalance in cardiac adverse events, "clinically significant adverse events" that were among the more "serious" safety concern category in drug development. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived the market of information critical to its assessing HEPLISAV-B's timeline and prospects for FDA approval.

64.     Also on March 8, 2016, the Company filed with the SEC the 2015 10-K.[9]  In a section of the 2015 10-K, beginning on page 3, entitled "Business," the Company discussed its technology, including, among other things, HEPLISAV-B.  The Company stated, in relevant part, as follows:

> The primary objectives of HBV-23 were: (1) to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events; and (2) to demonstrate the noninferiority of the peak seroprotection rate induced by HEPLISAV-B compared to Engerix-B in subjects with type 2 diabetes mellitus. HEPLISAV-B subjects were evaluated for safety for one year following the second dose.

> Based on preliminary top-line results from HBV-23 released in January 2016, both co-primary endpoints were met. The rates of clinically significant adverse events were consistent with randomization and HEPLISAV-B provided a statistically significant higher rate of seroprotection than Engerix-B in diabetic participants and in all participants as a group.

_____

[9] Defendants Gray and Ostrach signed the 2015 10-K.

Consolidated Second Amended Class Action Complaint

\*\*\*\*\*

> At the end of the first quarter of 2016, we intend to submit to FDA our revised BLA and respond to all questions raised in the CRL. We currently expect the submission will be assigned a 6-month Prescription Drug User Fee Act ("PDUFA") review period. If this timing is correct and HEPLISAV-B is approved upon completion of the review period, we expect to launch the product in the fourth quarter of 2016.

65.     The foregoing statements in the 2015 10-K were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that the "co-primary endpoint of HBV-23 was to evaluate the overall safety of [HEPLISAV-B] with respect to clinically significant adverse events," Defendants were duty bound to make full and complete disclosure regarding the occurrence during HBV-23 of the numerical imbalance in cardiac adverse events, "clinically significant adverse events" that were among the more "serious" safety concern category in drug development. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived the market of information critical to its assessing HEPLISAV-B's timeline and prospects for FDA approval.

***The March 30 Press Release and March 31 Form 8-K***

66.     On March 30, 2016, Dynavax issued a press release (the "March 30 Press Release"), which was also attached as Exhibit 99.1 to the Form 8-K filed with the SEC on March 31, 2016 (the "March 31 Form 8-K"), announcing that the FDA had accepted for review Dynavax's BLA for HEPLISAV-B.

67.     The March 30 Press Release stated, in pertinent part, the following:

> The HEPLISAV-B BLA is based on positive immunogenicity results from clinical trials that have generated safety data in more than 10,000 participants. Results of these trials showed that two doses of

Consolidated Second Amended Class Action Complaint

> HEPLISAV-B given one month apart provides significantly higher rates of protection with an equivalent safety profile compared to three doses of Engerix-B, a currently marketed hepatitis B vaccine that is administered over six months.

68.     The foregoing statements in the March 30 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that that HEPLISAV-B "provides … an equivalent safety profile compared to three doses of Engerix-B," Defendants were duty bound to make full and complete disclosure regarding the occurrence during HBV-23 of the numerical imbalance in cardiac adverse events, "clinically significant adverse events" that were among the more "serious" safety concern category in drug development. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived the market of information critical to its assessing HEPLISAV-B's timeline and prospects for FDA approval.

***The April 18 Press Release and April 19 Form 8-K***

69.     On April 27, 2016, Dynavax issued a press release (the "April 27 Press Release"), which was also attached as Exhibit 99.1 to the Form 8-K filed with the SEC on the same day (the "April 27 Form 8-K"), announcing that the Company had "receive[d] notification of PDUFA extension for HEPLISAV-B to December 15, 2016."

70.     The April 27 Press Release stated, in pertinent part, the following:

> HEPLISAV-B has a safety profile similar to that of existing vaccines. The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 10,000 HEPLISAV-B compared with more than 4000 ENGERIX-B participants. The most frequently reported local reaction was injection site pain. The most common systemic reactions were fatigue, headache and malaise.

71.     The foregoing statements in the April 27 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that that HEPLISAV-B showed "a safety profile similar to that of existing vaccines," Defendants were duty bound to make full and complete disclosure regarding the occurrence during HBV-23 of the numerical imbalance in cardiac adverse events, "clinically significant adverse events" that were among the more "serious" safety concern category in drug development. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived the market of information critical to its assessing HEPLISAV-B's timeline and prospects for FDA approval.

### The June 11 Press Release and June 15 Form 8-K

72.     On June 11, 2016, Dynavax issued a press release (the "June 11 Press Release"), which was also attached as Exhibit 99.1 to the Form 8-K filed with the SEC on June 15, 2016 (the "June 15 Form 8-K"),[10] announcing that the Company had presented new efficacy data on HEPLISAV-B at the 76th Annual Scientific Sessions of the American Diabetes Association.

73.     The June 11 Press Release stated, in pertinent part, the following: "In the total trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups." About HEPLISAV-B's safety profile, the June 11 Press Release also stated, in pertinent part, as follows:

> The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 14,000 participants. The most frequently reported local reaction was injection site pain. The most

[10] Defendant Ostrach signed the June 15 Form 8-K.

common systemic reactions were fatigue, headache and malaise, all of which were similar to Engerix-B.

74.     The foregoing statements in the June 11 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that that HEPLISAV-B showed "rates of adverse events, serious adverse events and deaths were similar between HEPLISAV-B and Engerix-B groups," and by disclosing adverse events such as "injection site pain" and "fatigue, headache and malaise," Defendants were duty bound to make full and complete disclosure regarding the occurrence during HBV-23 of the numerical imbalance in cardiac adverse events, "clinically significant adverse events" that were among the more "serious" safety concern category in drug development. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived the market of information critical to its assessing HEPLISAV-B's timeline and prospects for FDA approval.

***The August 5 Press Release and August 8 Form 8-K***

75.     On August 5, 2016, Dynavax issued two press releases (the "August 5 Press Releases"), which were also attached as Exhibits 99.1 and 99.2 to the Form 8-K filed with the SEC on August 8, 2016 (the "August 8 Form 8-K"), announcing, respectively, Dynavax's financial results for the second fiscal quarter ended June 30, 2016 and the FDA's scheduling of the Vaccines and Related Biological Products Advisory Committee's meeting to review HEPLISAV-B.

76.     In one of the August 5 Press Releases, the Company stated, in pertinent part, as follows:

In Phase 3 trials, HEPLISAV-B demonstrated higher and earlier protection with fewer doses than a currently licensed hepatitis B

vaccine. It also demonstrated a similar safety profile to the existing vaccine.

The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 14,000 participants. The most frequently reported local reaction was injection site pain. The most common systemic reactions were fatigue, headache and malaise, all of which were similar to an existing vaccine.

77.     The foregoing statements in the August 5 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Having disclosed that that HEPLISAV-B "has a similar safety profile to the existing vaccine" and by disclosing adverse events such as "injection site pain" and "fatigue, headache and malaise," Defendants were duty bound to make full and complete disclosure regarding the occurrence during HBV-23 of the numerical imbalance in cardiac adverse events, "clinically significant adverse events" that were among the more "serious" safety concern category in drug development. In the context of their providing a timeline that indicated that the FDA could approve HEPLISAV-B by the fourth quarter of 2016, Defendants' omission of the numerical imbalance in cardiac adverse events deprived the market of information critical to its assessing HEPLISAV-B's timeline and prospects for FDA approval.

**The September 4 Press Release and September 6 Form 8-K**

78.     On September 4, 2016, Dynavax issued a press release (the "September 4 Press Release"), which was also attached as Exhibit 99.1 to the Form 8-K filed with the SEC on September 6, 2016 (the "September 6 Form 8-K"),[11] providing a "regulatory update on HEPLISAV-B."

---

[11] Defendant Ostrach signed the September 6 Form 8-K.

Consolidated Second Amended Class Action Complaint

79.     The September 4 Press Release stated, in pertinent part, as follows:

> During recent conversations between Dynavax and the FDA, the Agency communicated decisions to enable compliance with the current Prescription Drug User Fee Act (PDUFA) date of December 15, 2016. The Agency informed Dynavax that the VRBPAC meeting was cancelled and remaining questions will be addressed between Dynavax and the review team via the normal process. The FDA informed Dynavax that it plans to provide information requests related to remaining questions in the upcoming weeks. Dynavax is prepared to address these questions expeditiously in order to enable the FDA to complete its review as soon as possible.

> "Our dialogue with the FDA has been very open and productive, and we look forward to providing the review team with any additional information they may need to complete their review," said Eddie Gray, chief executive officer of Dynavax. "We are committed to bringing HEPLISAV-B to market as we believe it offers a better level of protection than the currently available hepatitis B vaccines."

> *****

> The FDA subsequently issued a public notice on September 2, 2016 of the decision to cancel the previously scheduled VRBPAC meeting. That notice summarized the cancellation decision, the intent to resolve outstanding questions and scheduling of a future VRBPAC meeting, if needed.

80.     The foregoing statements in the September 4 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures, notwithstanding that the FDA had, no later than September 4, expressed concerned about that safety data. By disclosing that the FDA had issued "information requests" to the Company and that the agency had "remaining questions" for the Company that "will be addressed between Dynavax and the [FDA] review team via the normal process," Defendants became duty bound to make full and complete disclosure of the existence of any such "information requests" or "remaining questions" regarding any outstanding issues that threatened to derail timely FDA approval of HEPLISAV-B. As Defendants later admitted, one of the topics on which the FDA requested information and/or had

"remaining questions" was the numerical imbalance in cardiac adverse events. Indeed, given that Defendants had been engaged with the FDA in a "very open and productive" "dialogue," they knew or recklessly disregarded that prior to September 4, 2017, the FDA had expressed concern about the numerical imbalance in cardiac adverse events. By failing to disclose that the FDA had specific concerns with the numerical imbalance in cardiac adverse events Defendants encountered for the first time in HBV-23, Defendants concealed the enhanced risk that the FDA would delay approving the HEPLISAV-B BLA.

***The October 3 Form 8-K***

81.    On October 3, 2016, the Company filed a Current Report on Form 8-K with the SEC (the "October 3 Form 8-K").[12]  In the October 3 Form 8-K, the Company stated, in pertinent part, as follows:

> Dynavax Technologies Corporation ("Dynavax") received anticipated requests for information from the U.S. Food and Drug Administration's ("FDA") review team in connection with the pending Biologics License Application ("BLA") for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)]. The review team's questions are in line with the company's expectations.
>
> The company is working with the FDA to resolve remaining questions regarding the BLA in order to enable the FDA to complete its review by the scheduled Prescription Drug User Fee Act ("PDUFA") action date of December 15, 2016, which remains unchanged.

82.    The foregoing statements in the October 3 Form 8-K were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures. Indeed, Defendants' statement that the FDA "review team's questions are in line with the company's expectations" shows that they knew that the FDA would at least question the numerical imbalance in

---

[12] Defendant Ostrach signed the October 3 Form 8-K.

cardiac adverse events and that by October 3, 2016, the review team had, in fact, raised that very issue with Defendants. Defendants, however, continued to omit both the numerical imbalance in cardiac adverse events and that the FDA had expressed concern about that safety data. By failing to disclose that the FDA had specific concerns with the numerical imbalance in cardiac adverse events Defendants encountered for the first time in HBV-23, Defendants concealed the enhanced risk that the FDA would delay approving the HEPLISAV-B BLA.

***The October 26 Press Release and October 27 Form 8-K***

83.     On October 26, 2016, Dynavax issued a press release (the "October 26 Press Release"), which was also attached as Exhibit 99.1 to the Form 8-K filed with the SEC on October 27, 2016 (the "October 27 Form 8-K"),[13] announcing "sub-group results from HBV-23, the pivotal Phase 3 trial of its investigational hepatitis B vaccine HEPLISAV-B."

84.     The October 26 Press Release stated in pertinent part, as follows:

> ***Results of New Analysis of Phase 3 Study (Poster #754)***
>
> The pivotal Phase 3 trial, HBV-23, was a randomized, observer-blinded, active-controlled, multi-center study that compared two doses of HEPLISAV-B over four weeks with three doses of Engerix-B over 24 weeks in 8,374 adults age 18 to 70. Demographics consisting of age, sex and race were generally similar between the two treatment arms. Overall study results showing a significantly higher seroprotection rate with HEPLISAV-B versus Engerix-B (95.4 percent at week 24 vs. 81.3 percent at week 28, respectively) and comparable safety were previously reported.
>
> *****
>
> In the total Phase 3 trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. The most common local adverse event was injection site pain and the most common systemic adverse events were fatigue, headache and malaise.

---

[13] Defendant Ostrach signed the October 27 Form 8-K.

Consolidated Second Amended Class Action Complaint

\*\*\*\*\*

The Biologics License Application for HEPLISAV-B is currently being reviewed by the U.S. Food and Drug Administration, which has established a Prescription Drug User Fee Act (PDUFA) action date of December 15, 2016.

85. The foregoing statements in the October 26 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures, notwithstanding that the FDA had, no later than September 4, expressed concerned about that safety data. Defendants' statements that HEPLISAV-B's safety profile was "comparable" to that of Engerix-B and that "[i]n the total Phase 3 trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups" were false. By failing to disclose that the FDA had specific concerns with the numerical imbalance in cardiac adverse events Defendants encountered for the first time in HBV-23, Defendants concealed the enhanced risk that the FDA would delay approving the HEPLISAV-B BLA.

86. The October 26 Press Release also stated, in pertinent part, as follows:

In Phase 3 trials, HEPLISAV-B demonstrated higher and earlier protection with fewer doses than a currently licensed hepatitis B vaccine. The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 14,000 participants. The most frequently reported local reaction was injection site pain. The most common systemic reactions were fatigue, headache and malaise, all of which were similar to an existing vaccine.

87. The foregoing statements in the October 26 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures, notwithstanding that the FDA had, no later than September 4, expressed concerned about that safety data. In addition, by disclosing adverse events such as "injection site pain" and "fatigue, headache

and malaise," Defendants were duty bound to make full and complete disclosure regarding the imbalance in cardiac adverse events, given the FDA's known concern regarding cardiac adverse events and its "primary interest" in "understanding the detail of any specific case." By failing to disclose that the FDA had specific concerns with the numerical imbalance in cardiac adverse events Defendants encountered for the first time in HBV-23, Defendants concealed the enhanced risk that the FDA would delay approving the HEPLISAV-B BLA.

***The November 7, 2016 Press Release and Form 8-K***

88.     On November 7, 2016, Dynavax issued a press release (the "November 7 Press Release"), which was also attached as Exhibit 99.1 to the Form 8-K filed with the SEC on the same day (the "November 7 Form 8-K"), announcing Dynavax's financial results for the third fiscal quarter ended September 30, 2016.

89.     The November 7 Press Release stated, in pertinent part, as follows:

> HEPLISAV-B. In late August, the U.S. Food and Drug Administration (FDA) cancelled its previously scheduled Vaccines and Related Biological Products Advisory Committee (VRBPAC) meeting to review the Biologics License Application (BLA) for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)]. The FDA indicated that remaining questions on the BLA will be addressed between Dynavax and the FDA review team. The Company has since provided responses to information requests by the FDA related to remaining questions. The FDA also confirmed in August that it will not include in its review of the BLA the immunogenicity data submitted by the Company related to sub-populations, including results in individuals with diabetes. The Company plans to submit these data as a supplemental BLA.

> The Prescription Drug User Fee Act (PDUFA) date for the HEPLISAV-B BLA is December 15, 2016.

> *****

> In the total Phase 3 trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. The data were presented at the Infectious Diseases

Consolidated Second Amended Class Action Complaint

Society of America's (IDSA) annual IDWeek 2016 meeting in New Orleans.

90.     The foregoing statements in the November 7 Press Release were false and misleading because Defendants knew or recklessly disregarded that data from HBV-23 showed a numerical imbalance in cardiac adverse events, information that Defendants omitted from their disclosures, notwithstanding that the FDA had, no later than September 4, expressed concerned about that safety data. By failing to disclose that the FDA had specific concerns with the numerical imbalance in cardiac adverse events Defendants encountered for the first time in HBV-23, Defendants concealed the enhanced risk that the FDA would delay approving the HEPLISAV-B BLA.

**The Truth Emerges**

91.     The truth began to emerge on September 2, 2016, when the FDA issued a public notice cancelling the scheduled November 16, 2016 meeting of the Vaccines and Related Biological Products Advisory Committee (VRBPAC) to review Dynavax's new BLA to "allow time for the FDA to review and resolve several outstanding issues."  On this news, the stock price per share of Dynavax declined from $15.94 on September 1, 2016, to close at $10.91 on September 2, 2016, raising serious concerns among Dynavax's investors about the BLA for HEPLISAV-B and the design of HBV-23.

92.     In November, 2016, the FDA issued a second CRL to Dynavax.  Before the market opened on November 14, 2016, Dynavax issued a press release stating in relevant part as follows:

> The CRL seeks information regarding several topics, including clarification regarding specific adverse events of special interest (AESIs), a numerical imbalance in a small number of cardiac events in a single study (HBV-23), new analyses of the integrated safety data base across different time periods, and post-marketing commitments. In the CRL, the FDA acknowledged that it has not yet completed its review of responses received from Dynavax in early October, including those pertaining to AESIs and the numerical imbalance in cardiac events. The responses included an extensive analysis that included independent expert consultation supporting our view that the imbalance was driven by an unexpectedly low number of events in the

comparator arm. It would appear the Agency could not fully assess the responses in the current review period. In the CRL, there is no request for additional clinical trials and there are no apparent concerns with rare serious autoimmune events.

93.     In an effort to downplay the issuance of the second CRL, the November 14, 2016 press release quoted Dynavax CEO Gray as stating, "The CRL is consistent with our opinion that HEPLISAV-B is approvable and we are seeking to meet with the FDA as soon as possible.  However, the time and resources that will be required to gain approval leads us to consider that we may not be able to advance this program on our own and we are moving swiftly to identify a potential pharmaceutical or financial partner. We will maintain our efforts on the oncology programs, including our lead cancer immunotherapy candidate, SD-101, for which we recently announced encouraging early clinical data in metastatic melanoma."

94.     In the aftermath of the Company's November 14, 2016 announcement, analysts expressed surprise at the disclosure of a numerical imbalance of cardiac events and concern that management had little information regarding the nature and number of cardiovascular events.

95.     For example, during the earnings call that same day, analyst Simos Simeonidis, of RBC Capital Markets, pressed Defendants for more details regarding their belated disclosure of the cardiac events during HBV-23:

> In terms of the cardiac events that you are mentioning in the press release and I guess a big part of the CRL, were you surprised this was a focus of the -- for the FDA? Can you tell us what kind of events these were? Were these MIs or pulmonary embolisms for example? And what kind of imbalance are we talking about? I don't know if you want to give the numbers or can you talk about the fold? Is it like a 2 versus 1 or was it like an 8 versus 1, something that was more significant?

Transcript of Nov. 11, 2016 Dynavax Tech. Corp. Earnings Conference Call ("11/14/16 Tr.") at 7.

96.     Defendants, however, refused to provide any further detail.   Defendant Gray responded:

Consolidated Second Amended Class Action Complaint

1
2
3
4
5

> So we are not going to go into any more detail than we have given because obviously we now want to get into conversations with partners about all of the data including the context of that. We have been imbalance in a single term which the agency referred to as cardiac events and so we have utilized their language in our communication of it. And we simply don't want discussion of individual numbers which are not representative of the story whilst we try to have those conversations.

6   11/14/16 Tr. at 7.

7
8
9

97.   Simeonidis then followed up with Defendant Gray regarding Defendants' lack of transparency concerning the occurrence of cardiac events during HBV-23:

10
11
12
13

> But aren't you concerned that by not having more transparency as to what these events are, the imbalance, that is going to continue to be an issue for investors that there is something out there that they don't know about the significance of it, the impact of it and for the next nine, 10 months or a year, analysts and investors won't know what the major issue is?

14   11/14/16 Tr. at 8.

15
16

98.   Defendant Gray responded to Simeonidis by again refusing to disclose further information regarding the occurrence of cardiac events during HBV-23:

17
18
19
20
21
22

> No, I mean I think there is always a sort of cutoff point in what is reported and you and I both know as does everybody on the line that the sort of general convention is that it would not be normal practice to talk about numeric imbalances unless it reaches some degree of statistical significance or it perhaps you feel there is a good reason to believe that there might be a relationship. This situation meets neither of those criteria and I think I will ask Rob as our Chief Medical Officer who has lived with this data for the last year to give you his assurance of our confidence in this position.

23
24   11/14/16 Tr. at 8.

25   99.   Defendant Janssen then added:

26
27
28

> So I led the team that did all the analyses and wrote the BLA and responses to the information requests and actually did many of the analyses myself, wrote the response to the information requests. We did seek external consultation from very highly regarded external experts.   And all of this expanded work I think just continued to

- 34 -

Consolidated Second Amended Class Action Complaint

> convince me that there is no relationship between the cardiac events and the vaccine and in fact is due to an unexpectedly low rate in the Engerix arm.

11/14/16 Tr. at 8. Defendants never disclosed who these "very highly regarded external experts" were, nor did they reveal what conclusions, if any, such experts ultimately reached regarding the cardiac adverse events.

100.    Analysts remained unconvinced by Defendants' responses, however.  In a report issued later that same day, for example, Simeonidis, writing on behalf of RBC Capital Markets, stated that "we were surprised to see for the first time the disclosure of cardiac events imbalance in HBV-23 given as one of the reasons for the CRL, in addition to the agency's known concerns about AESIs." He continued:

> AESIs have been a known area of concern for the agency and this is something investors have had the opportunity to investigate. The imbalance in cardiac events is something we're seeing disclosed for the first time by Dynavax, which is surprising, given that 1) cardiac events definitely fall within the more "serious" safety concern category in drug development; and 2) the company had recently disclosed that the questions it had received from FDA were ***"in line with expectations." An imbalance in cardiac events in Phase III that would be significant enough to be of concern to FDA was definitely not among the expectations that investors have had for this trial and for this program***. (Emphasis in original).

Report of RBC Capital Markets on Dynavax Tech. Corp. (11/14/16) at 1.

101.    Analyst Katherine Xu, of William Blair, stated in her report issued the following day that, "[a]mong the additional information the FDA requested, the disclosure of the numerical imbalance of cardiovascular event was news to us."  Report of William Blair on Dynavax Tech. Corp. (11/15/16) at 1.  She advised investors that, in light of the occurrence of the cardiac events, and the FDA's determination that a "final definitive conclusion would 'require additional consultation, discussion, and analysis,' as described in the CRL," "[t]he fastest timeline for a potential approval, if any, would be about nine months from now, by our estimation." *Id.* at 2.  She concluded:

Consolidated Second Amended Class Action Complaint

> ***Possible scenarios going forward.*** As discussed above, it is possible that Heplisav approval based on the company's response to the second CRL in late 2017. It is also possible that the FDA calls for a panel to discuss the cardiac events if it deems necessary, in which case a final approval, if any, could be further delayed. Another possibility is that the FDA asks for another study to assess the incidence of the cardiac events, which we believe is not quite as likely.

*Id.*

102.   Analyst Anupam Rama, of JPMorgan, opined as follows concerning the significance of the regulatory risk from an investor's perspective:

> This morning, Dynavax announced that the FDA has issued another Complete Response Letter (CRL) for Heplisav Hepatitis B vaccine. When we downgraded DVAX shares in April, regulatory risk / uncertainty was a central component to the thesis (along with market concerns). Indeed, the FDA appears to have several outstanding questions regarding the filing, and today a numerical imbalance in cardiac events was also highlighted (nature of events unknown). Of note, no additional trials have been requested, and Dynavax will work to submit answers to the FDA's questions (timeframe unknown). Further, the company will now be looking for a partner to help offset costs of getting Heplisav across the goal-line. However, given the uncertainty that surrounds this most recent round of review, the likelihood of a potential partnership is unclear in the near term, in our view. Net-net, given ongoing uncertainty for Heplisav and the early-stage of the company's oncology asset SD-101, we are reiterating our Neutral rating on DVAX shares but withdrawing our December 2017 price target due to an uncertain path forward and economics related to Heplisav.

Report of JPMorgan on Dynavax Tech. Corp. (11/14/16) at 1.

103.   On this news, the price of Dynavax common stock declined from $11.60 per share on November 11, 2016, to close at $4.10 per share on November 14, 2016, a drop of approximately 64%.

104.   After the Class Period, in a press release issued on March 13, 2017, Defendants made the following disclosure:

> As part of the January restructuring, the company suspended manufacturing activities, commercial preparations and other longer term investment related to HEPLISAV-B during the regulatory review period and reduced its global workforce by approximately 40%. If the

Consolidated Second Amended Class Action Complaint

product is approved, Dynavax plans to satisfy anticipated initial demand from existing stockpiled inventory and to scale up commercial activities based on market demand and investment priorities.

105.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

106.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Dynavax securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

107.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dynavax securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Dynavax or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

Consolidated Second Amended Class Action Complaint

109.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and management of Dynavax;

- whether the Individual Defendants caused Dynavax to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Dynavax securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages?

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

112.    The market for Dynavax securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Dynavax securities traded at artificially inflated prices during the Class Period.  Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Dynavax securities and the market information relating to Dynavax, and have been damaged thereby.

113.    During the Class Period, the artificial inflation of Dynavax stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Dynavax's business, operations and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of Dynavax and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

114.    At all relevant times, the market for Dynavax securities was an efficient market for the following reasons, among others:

    a.   Dynavax stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.  As a regulated issuer, Dynavax filed periodic public reports with the SEC and/on the NASDAQ;

c.  Dynavax regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.  Dynavax was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

115.  As a result of the foregoing, the market for Dynavax securities promptly digested current information regarding Dynavax from all publicly available sources and reflected such information in Dynavax's stock price. Under these circumstances, all purchasers of Dynavax securities during the Class Period suffered similar injury through their purchase of Dynavax securities at artificially inflated prices, and a presumption of reliance applies.

116.  Alternatively, because this case involves the omission of the numerical imbalance in cardiac adverse events, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NO SAFE HARBOR**

117.    Dynavax's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

118.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Dynavax who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### against All Defendants

119.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

121.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices

and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Dynavax securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Dynavax securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

122.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Dynavax securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Dynavax's disclosure controls and procedures.

123.    By virtue of their positions at Dynavax, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with

reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

124.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Dynavax, the Individual Defendants had knowledge of the details of Dynavax's internal affairs.

125.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Dynavax. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Dynavax's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Dynavax securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Dynavax's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Dynavax securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

126.   During the Class Period, Dynavax securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Dynavax securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members

of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Dynavax securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Dynavax securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

127. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

128. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**against the Individual Defendants**

129. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130. During the Class Period, the Individual Defendants participated in the operation and management of Dynavax, and conducted and participated, directly and indirectly, in the conduct of Dynavax's business affairs. Because of their senior positions, they knew the adverse non-public information about Dynavax's operations, current financial position and future business prospects.

131. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Dynavax's business

practices, and to correct promptly any public statements issued by Dynavax which had become materially false or misleading.

132.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Dynavax disseminated in the marketplace during the Class Period concerning the Company's disclosure controls and procedures. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Dynavax to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Dynavax within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Dynavax securities.

133.    Each of the Individual Defendants, therefore, acted as a controlling person of Dynavax. By reason of their senior management positions and/or being directors of Dynavax, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Dynavax to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Dynavax and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

134.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Dynavax.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 3, 2017                    Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**

                                          /s/ *Laurence M. Rosen*
                                          Laurence M. Rosen, Esq. (SBN 219683)
                                          355 S. Grand Avenue, Suite 2450
                                          Los Angeles, CA 90071
                                          Telephone: (213) 785-2610
                                          Facsimile: (213) 226-4684
                                          Email: lrosen@rosenlegal.com

                                          and

                                          Jacob A. Goldberg
                                          Keith R. Lorenze
                                          101 Greenwood Avenue, Suite 440
                                          Jenkintown, PA  19046
                                          Telephone: (215) 600-2817
                                          Facsimile: (212) 202-3827
                                          Email: jgoldberg@rosenlegal.com

                                          ***Counsel for Lead Plaintiff and the Class***

- 46 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2017, I electronically filed the foregoing *Consolidated Second Amended Class Action Complaint for Violation of the Federal Securities Laws* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

- 47 -